THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| INTERNATIONAL NEWS INC., <br><br> Plaintiff, <br><br> v. <br><br> 10 DEEP CLOTHING INC., <br><br> Defendant. | CASE NO. C18-0302-JCC <br><br> ORDER |

This matter comes before the Court on Plaintiff's motion for partial summary judgment (Dkt. No. 30), Plaintiff's motion to supplement (Dkt. No. 87), Defendant's motion to strike (Dkt. No. 94), and the parties' outstanding motions to seal (Dkt. Nos. 66, 72, 100, 112). Having thoroughly considered the briefing and relevant record, the Court finds oral argument unnecessary and hereby GRANTS Plaintiff's motion for partial summary judgment (Dkt. No. 30) in part and DENIES the motion in part, GRANTS Plaintiff's motion to supplement (Dkt. No. 87), DENIES Defendant's motion to strike (Dkt. No. 94), and GRANTS the parties' outstanding motions to seal (Dkt. Nos. 66, 72, 100, 112) for the reasons explained herein.

**I.    BACKGROUND**

In or around 2006, the parties discussed a potential business relationship whereby Plaintiff would source and distribute apparel designed and marketed by Defendant. (Dkt. Nos. 1 at 1; 32 at 1, 2.) The parties now dispute the nature of the nature of this relationship. Plaintiff

1 asserts it was strictly a payment for services arrangement; Defendant asserts it was a joint
2 venture, where Plaintiff would bear the risk of loss for the entire venture. (*See generally* Dkt.
3 Nos. 30, 68, 73.) Relevant facts, based on the evidence presented, follow.

4       The parties executed an "Interim Agreement" in June 2007 to cover the Spring and
5 Summer 2007 fashion seasons. (Dkt. Nos. 32 at 3; 32-1 at 15–16.) They had previously
6 discussed a long-term arrangement, but could not come to terms.[1] According to the Interim
7 Agreement, Defendant sought the services of Plaintiff to "purchase, import, warehouse and ship
8 certain [Defendant]-branded inventory." (Dkt. Nos. 32 at 3; 32-1 at 12.) Under the arrangement,
9 sales proceeds "shall be paid . . . to [Plaintiff] . . . [who] shall deduct and retain [its costs and a
10 10% fee], and pay the balance to Defendant." (Dkt. No. 32-1 at 15.) Defendant guaranteed that
11 Plaintiff "shall be paid . . . out-of-pocket expenditures . . . plus 10% of the wholesale value of the
12 inventory." (Dkt. Nos. 32 at 3–4; 32-1 at 15–16.) There is no dispute between the parties that this
13 document was executed or that Defendant executed an extension of the Interim Agreement,
14 provided to Defendant by Plaintiff, to continue the arrangement through "the Fall '07 and
15 Holliday [sic] '07 fashion seasons." (Dkt. Nos. 32-1 at 22.) That extension also stated that, "The
16 Interim Agreement will be deemed to continue thereafter if, at [Defendant's] request, [Plaintiff]
17 continues to purchase, import, warehouse and/or ship Inventory for current and subsequent
18 seasons." (*Id*.) No additional written agreement was ever executed and the parties' course of
19 dealings was consistent with this agreement through the 2016 fashion season.[2]

---

[1] Prior dealings included: Defendant's proposal via e-mail whereby Plaintiff would source and ship Defendant's product, handle all invoicing and collections, provide financial support, i.e., credit, and remit the proceeds to Defendant after deducting a fee of 10% of gross sales and 35% of net profits. (Dkt. Nos. 32 at 2; 32-1 at 5.) This was followed by Plaintiff's proposed "Teaming Agreement," whereby Plaintiff would take on the "financial risk" of the venture in exchange for an exclusive license to Defendant's trademarks and the option to purchase a 49% equity interest in Defendant. (Dkt. Nos. 32 at 2; 32-1 at 7–9.) In exchange, Defendant would also receive guaranteed income, before the parties' proposed 35/65 profit split, of $450,000 per quarter. (*Id.*) The parties never executed these proposals. (Dkt. No. 32 at 3.)

[2] Plaintiff alleges that the parties orally modified the Interim Agreement in 2010 to incorporate a profit-and-loss sharing arrangement. (Dkt. No. 30 at 6.) Specifically, "profits or

Defendant asserts "the Interim Agreement does not accurately capture the terms and provisions of the parties' actual [oral] [a]greement." (Dkt. No. 68-2 at 5, 8.) From day one, according to Defendant, its understanding of the arrangement was that it was a joint venture, where Plaintiff had a 35% share in the profits and losses and, in exchange, would bear the *entire* financial risk of the venture. (Dkt. No. 68-2 at 5–7.)

Throughout the parties' dealings Plaintiff's Controller sent Defendant's accountants reports showing a running balance between the parties. (Dkt. No. 31 at 1–2; 31-1 at 5–61; 32 at 4–5.) The balance increased as advances were made to Defendant. (*Id.*) It also increased as Plaintiff incurred production expenses. (*Id.*) The balance would be reduced as sales of Defendant's goods were made. (*Id.*) Defendant recorded this amount on its books as a negative asset and reflected the amount on its tax return as a liability. (Dkt. Nos. 34 at 4–18; 75 at 23, 24; 103-1 at 34, 102, 163, 250, 320, 383.) Over the years, distributions to Defendant and Plaintiff's costs outpaced revenue and the balance grew. (Dkt. No. 30 at 8.) This accelerated in 2015, when sales of Defendant's product started to lag. (*Id.* at 9.) By the end of 2016, the balance reached $3,522,711.72. (Dkt. No. 31-1 at 78, 81.) Plaintiff notified Defendant via e-mail in the Spring of 2017 that, given the current balance between the two, Plaintiff could not advance additional funds to Defendant. (Dkt. No. 32-1 at 25.) In response, Defendant stated its intent to terminate the parties' relationship at the end of that fashion season. (Dkt. No. 32-1 at 25.)

Plaintiff filed the instant lawsuit in February 2018, alleging breach of contract, unjust enrichment, and promissory estoppel. (*See generally* Dkt. No. 1.) Defendant answered and asserted counterclaims for breach of contract, unjust enrichment, promissory estoppel, declaratory judgment, and accounting. (Dkt. No. 24.) Plaintiff seeks the amount it claims is owed on the intercompany balance, with interest. (Dkt. No. 1 at 7.) Defendant seeks compensatory damages and a declaration that it is not liable for repayment of the alleged intercompany balance.

---

losses would be divided 65% to [Defendant] and 35% to [Plaintiff] thereafter." (*Id.*) The parties' course of dealings is consistent with this modification.

ORDER
C18-0302-JCC
PAGE - 3

(Dkt. No. 24 at 20–21.)

Presently before the Court is Plaintiff's motion for partial summary judgment. (S*ee generally* Dkt. No. 30.) Plaintiff seeks a judgment on its breach of contract claim and dismissal of Defendant's counterclaims. Defendant opposes, asserting that sufficient questions of fact exist surrounding the nature of its agreement with Plaintiff. (*See generally* Dkt. No. 68.) The Court must also consider Plaintiff's motion to supplement (Dkt. No. 87),[3] which Defendant moves to strike or, in the alternative, asks for leave to file a sur-reply (Dkt. No. 94), and various motions to seal documents that the Court has not yet issued a ruling on. (Dkt. Nos. 66, 72, 100, 112).

## II.   DISCUSSION

### A.   Motion for Partial Summary Judgment

#### 1.   Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In deciding whether there is a genuine dispute of material fact, the court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Id.* at 255. The Court is therefore prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

"The moving party bears the initial burden of establishing the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything,

---

[3] Counsel fashioned the filing as a declaration, but it includes a request that the Court allow the filing of various supplemental documents, so will be considered by the Court as a motion to supplement the record. (*See* Dkt. No. 87.)

even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But once the moving party properly supports its motion, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### 2. Plaintiff's Breach of Contract Claim

"Generally, a plaintiff in a contract action must prove a valid contract between the parties, breach, and resulting damage." *Lehrer v. State, Dep't of Soc. & Health Servs.*, 5 P.3d 722, 727 (2000). At issue in this case is what, in fact, was the agreement: did it require Defendant to repay the outstanding balance between the two? To answer this question the Court first looks to the parties' written dealings. Washington follows the "manifestation theory of contracts" whereby the Court must "attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (2005). The written word is the clearest expression of intent, but where necessary, extrinsic evidence, including course of dealings, can be used to ascertain that intent. *Berg v. Hudesman*, 801 P.2d 222, 229 (1990). Extrinsic evidence cannot be used to "show an intention independent of the instrument" or to "vary, contradict or modify the written word." *Hearst Commc'ns, Inc.*, 115 P.3d at 267.

The Court views the operative agreement to be the parties' Interim Agreement,[4] extended indefinitely in October 2007. (Dkt. No. 32-1 at 15, 16, 30.) In that agreement, Defendant

---

[4] It is of no matter to the Court whether Plaintiff countersigned the extension. The evidence clearly indicates that Plaintiff drafted the extension and submitted it to Defendant, who signed and returned it to Plaintiff. (*See* Dkt. No. 32-1 at 18–22.)

"guarantees that [Plaintiff] shall be paid . . . in any event" its out of pocket expenditures and fees. (*Id.* at 16.) Defendant emphatically asserts that it was never its intent to insure Plaintiff from loss. Defendant claims that it signed the Interim Agreement solely to allow Plaintiff to factor inventory and that it "does not fully reflect or capture the parties' relationship;" it was never intended to "constitute a long-term agreement covering the full scope of the parties' relationship." (Dkt. No. 68 at 8.) But Defendant's claims are contradicted by its course of dealings, namely, the manner in which the parties dealt with the intercompany balance accruing on their agreement.

Throughout the parties' roughly ten years of dealings, at least on a monthly basis, Plaintiff provided Defendant's accountants with detailed reports of the activity impacting the intercompany balance. (Dkt. No. 31 at 1–2; 31-1 at 5–61; 32 at 4–5.) When discrepancies arose, Plaintiff worked with Defendant's accountants to resolve them. (Dkt. No. 31-1 at 68–72, 74–76.) Defendant would record the activity and resulting balance owing on its own books and on its tax filings. (Dkt. Nos. 34 at 4–18; 75 at 23, 24; 103-1 at 34, 102, 163, 250, 320, 383.) On a number of occasions, the parties agreed to charge unrelated amounts owing between them against the balance. (Dkt. No. 75 at 2, 4, 6, 7, 9, 17, 18.) On at least two occasions, Defendant's accountant confirmed that the intercompany balance was, in fact, Defendant's debt to pay. In the first instance, Defendant's accountant noted as much on its working papers in 2012, indicating that the intercompany balance of $1,197.300.62 between the parties was "due to Inews." (Dkt. No. 75 at 26.) In the second instance, Plaintiff's auditors sought confirmation of the amount that Plaintiff recorded as an asset on its financial statements for the year ended December 31, 2016. (Dkt. No. 31-1 at 78–81.) Defendant's accountant, in no uncertain terms,[5] indicated to Plaintiff's auditors that the balance due from Defendant as of December 31, 2016 was $3,522,711.72. (*Id.*)

---

[5] In his declaration, Defendant's accountant claims that his prior admission was not a "substantive admission" of a "debt owed." (Dkt. No. 68-1 at 8.) But the Court fails to see why this is so.

Finally, when Defendant notified Plaintiff that it intended to terminate the relationship, Defendant then notified its accountant that it anticipated it would "need to pay/transfer some funds" to Plaintiff to wind things down, but needed the accountant's assistance in determining what this amount would be. (Dkt. No. 75 at 34.)

Defendant claims that the intercompany balance was a mechanism that Plaintiff used to track its investment in the parties' purported joint venture and that it was never Defendant's understanding that Defendant would be liable for those funds. (Dkt. No. 68 at 9.) In support, Defendant relies heavily on attestations of intent from its principal. (*See generally* Dkt. Nos. 68 at 15–18; 68-2 at 1–25.) But what is relevant here are the parties' *manifestations* of intent, not what their subjective intent may have been. *Hearst Commc'ns, Inc.*, 115 P.3d at 267. Defendant presents little evidence showing that either party manifested an intent to treat the intercompany balance as Plaintiff's investment in a joint venture.

Defendant first points to e-mails in 2013 and 2014 where Plaintiff's principal refers to the arrangement between the parties as a "JV." (Dkt. No. 68-1 at 19, 21, 23.) The parties may very well have envisioned a joint venture, but Defendant presents little evidence to suggest the parties manifested an intent that Plaintiff would bear the risk of loss for this venture. Defendant also points to a 2014 communication between Plaintiff's principal and Defendant's accountant. (Dkt. No. 68-1 at 26.) In that communication, Plaintiff's principal indicates the parties need to come up with a plan to "pay down the payables," i.e., the third-party debt that Plaintiff incurred to manufacture Defendant's product. (*Id.*) Defendant's accountant responded that this was Plaintiff's "responsibility as part of our working relationship . . . [Plaintiff] is paid the management fee and given profit share in exchange for carrying the responsibility of the payables and the duties associated with billing and collections." (*Id.*) But the term "carrying costs" normally implies a temporal arrangement, meaning costs are incurred and later recouped. *See, e.g.*, *Stormans, Inc. v. Selecky*, 854 F. Supp. 2d 925, 933 (W.D. Wash. 2012); *Nicholson v. Thrifty Payless, Inc.*, 2014 WL 618775, slip op. at *2 (W.D. Wash. 2014); *see also* COST,

Black's Law Dictionary (11th ed. 2019) (describing carrying cost as a "variable cost of stocking one unit of inventory for one year"). In this context, the statement regarding carrying costs is not helpful to Defendant. Nor does the Court find Defendant's reliance on the parties' 2016 discussions regarding the future of the arrangement to be helpful. At the time, Defendant expressed an interest in terminating the arrangement. (Dkt. No. 68 at 11.) Plaintiff responded that it could not afford to terminate because it owed significant funds to a third-party supplier and hoped that by continuing the arrangement, it could generate sufficient funds to repay the supplier. (*Id.* at 12.) This is not inconsistent with Plaintiff's position in this matter. Defendant paid Plaintiff a fee to finance the operation, i.e., utilize Plaintiff's credit with third-party suppliers to produce and distribute Defendant's product. Nothing in the record presented to the Court indicates that this manifested an intent that any resulting financial loss would be solely Plaintiff's to bear.[6]

Given the evidence presented, it is the Court's opinion that no rational trier of fact could conclude, based on the parties' outward manifestations, that the parties intended at the time they started doing business that, based on the extension of the Interim Agreement,[7] Plaintiff would bear the risk of loss for their venture. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (1986). Therefore, there is no genuine issue for trial as to Plaintiff's breach of contract claim. Accordingly, the Court GRANTS summary judgment on Plaintiff's breach of contract claim.

### 3. Defendant's Counterclaims

Defendant brings counterclaims for breach of contract, unjust enrichment, promissory estoppel, declaratory judgment, and accounting. (Dkt. No. 24 at 14–20.) Plaintiff seeks summary

---

[6] Defendant also references Plaintiff's internal e-mails demonstrating concern over the amounts owed to third-party suppliers. (Dkt. No. 68-2 at 228.) Again, this is not inconsistent with an agreement whereby Defendant would utilize Plaintiff's credit relationships in exchange for fees paid to Plaintiff. It would be in Plaintiff's best interest to maintain those relationships, regardless of who was legally obligated to pay those suppliers.

[7] The Court declines to consider Plaintiff's account stated argument. (*See* Dkt. No. 30 at 16–21.)

judgment on these counterclaims, arguing that the accounting records and operational history described above demonstrate the absence of any genuine issue of material fact relating to the application of the Interim Agreement. (Dkt. No. 30 at 21–22.)

As to the breach of contract counterclaim, Defendant alleges that, upon the expiration of the Interim Agreement, the parties entered into another agreement entitling Defendant to weekly advances from Plaintiff and by failing to provide such advances, Plaintiff breached this agreement. (Dkt. No. 24 at 14–15.) Defendant further alleges that the agreement required Plaintiff to "assume liability for the areas of [Defendant's] business over which Plaintiff had assumed responsibility" and that by claiming that Defendant bore a risk of loss, Plaintiff breached this agreement. (*Id.* at 15.) As discussed above, Plaintiff presents significant evidence that the 2007 Interim Agreement remained operative throughout the parties' dealings and Defendant provides little, if any, evidence to the contrary. *See supra* Part II.A.2. No rational trier of fact could conclude that the Interim Agreement was not, in fact, the operative agreement throughout the parties' dealings. Accordingly, the Court GRANTS summary judgment on Defendant's breach of contract counterclaim.

Plaintiff does not adequately address the basis for summary judgment on Defendant's remaining claims. (*See generally* Dkt. No. 30 at 21–22.) Accordingly, the Court DENIES summary judgment on Defendant's unjust enrichment, promissory estoppel, declaratory judgment, and accounting counterclaims.

### B. Motions to Supplement, Strike and Seal

Plaintiff moved to supplement the record to include documents produced after it filed its motion for summary judgment (Dkt. No. 87). Defendant moved to strike or, in the alternative, file a sur-reply (Dkt. No. 95). Given the additional briefing by both parties following Plaintiff's motion, (Dkt. Nos. 95, 101, 106, 113), the Court finds the prejudice to Defendant from Plaintiff's late filing is minimal. *See Reid v. Countrywide Bank, N.A.*, 2013 WL 7801758, slip op. at 2 (W.D. Wash.). Accordingly, the Court GRANTS Plaintiff's motion to supplement (Dkt. No. 87)

and DENIES Defendant's motion to strike (Dkt. No. 95).

Finally, regarding the motions to seal: On November 26, 2018, the Court entered the parties' stipulated protective order. (*See* Dkt. No. 28 at 2.) The parties submitted a variety of motions to seal in this matter based on documents produced in accordance with that order (Dkt. Nos. 29, 66, 72, 88, 91, 100, 112). The Court has previously ruled on three: Docket Numbers 29, 88 and 91. (*See* Dkt. Nos. 39, 98.) The parties assert that the documents at issue in the remaining motions contain or relate to confidential financial information, the disclosure of which would harm the parties' competitive standing in their industry. (*See* Dkt. Nos. 66, 72, 100, 112.) Having reviewed the documents, the Court finds that the parties have met their burden to establish a compelling reason to maintain them under seal. *See* 26 U.S.C. § 6103(a); *In re Elec. Arts, Inc.*, 298 F. App'x 568, 569 (9th Cir. 2008); *Ross v. Bar None Enters.*, 2014 WL 4109592, slip op. at 2 (E.D. Cal. 2014). Accordingly, the Court GRANTS the parties' pending motions to seal (Dkt. Nos. 66, 72, 100, 112). The Clerk is DIRECTED to maintain Docket Numbers 68, 75, 101, 103 and 113 under seal until further order of the Court.

## III.   CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment (Dkt. No. 30) is GRANTED in part and DENIED in part, Plaintiff's motion to supplement (Dkt. No. 87) is GRANTED, Defendant's motion to strike (Dkt. No. 94) is DENIED, and the parties' outstanding motions to seal (Dkt. Nos. 66, 72, 100, 112) are GRANTED for the reasons explained herein.

DATED this 8th day of October 2020.

John C. Coughenour
UNITED STATES DISTRICT JUDGE